JUDGE GRIESA                    11 CIV 7629 (TPG)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
OCT 27 2011
U.S.D.C. S.D. N.Y.
CASHIERS

HANNELORE HAHN and             )
ELIZABETH JULIA STOUMEN,       )    Case No.
        Plaintiffs,            )
                               )
vs.                            )
                               )    **COMPLAINT**
ITM TRADING, INC., GBA         )    JURY TRIAL DEMANDED
INVESTMENTS, LLC, and          )
STEPHANIE BROWN,               )    ECF Case
        Defendants.            )

Plaintiffs, by their counsel of record, for their Complaint in this action, allege upon information and belief as follows:

### JURISDICTION AND VENUE

1. This action arises under 15 U.S.C. §6101-08, and this Court has original jurisdiction of Plaintiff's federal claims under 15 U.S.C. §6104 and 28 U.S.C. §1331 and 1332; and of Plaintiffs' New York state law claims also under 28 U.S.C. §1332 and principles of pendent jurisdiction. The amounts claimed by Plaintiffs exceed the relevant jurisdictional amounts in 15 U.S.C. §6104 and 28 U.S.C. §1332.

2. Venue is appropriate in this Judicial District under 28 U.S.C. §1391(b) as Defendants do business and transact business in this Judicial District and because a substantial portion of the events, omissions and property which is the subject matter of this action are located in this District.

### PARTIES

3. Plaintiffs HANNELORE HAHN ("HAHN") and ELIZABETH JULIA STOUMEN ("STOUMEN") are natural persons residing in the State of New York, County of New York, in this Judicial District. HAHN is 84 years of age, and is an "elderly person" for purposes of N.Y. Bus. L. §349(c).

COMPLAINT                           1

4. Defendant ITM TRADING, INC. ("ITM") is an Arizona corporation, with principal place of business in Phoenix, Arizona.

5. Defendant GBA INVESTMENTS, LLC ("GBA") is an Arizona limited liability company, with principal place of business in Scottsdale, Arizona.

6. Defendant STEPHANIE BROWN is Manager of Defendant GBA, and was formerly employed by ITM.

7. ITM is a "telemarketer" for purposes of the Federal Trade Commission Telemarketing Sales Rule, 16 C.F.R. §310.1 et seq. because it solicits purchases of, among other things, "investment opportunities" by telephone in response to inquiries generated by advertisements on ITM's behalf.

## PLAINTIFF'S PURCHASES OF COINS FROM ITM TRADING

8. In 2007, Plaintiff STOUMEN heard advertisements by ITM on "The Randi Rhodes Show," a nationally-broadcast program delivered via radio to STOUMEN's New York residence. ITM's advertisements predicted the collapse of the U.S. dollar and the world economy generally, and told potential customers that investments in gold would enable them to maintain and increase their wealth in any economic conditions. These included statements of fact such as "Since the dollar hit its peak in July of 2001, it lost over 41 percent to its most recent low while gold went up over 278 percent."

9. STOUMEN responded to the advertisement by telephoning ITM from her New York residence. STOUMEN had no background or experience whatsoever in purchasing gold or other precious metals. STOUMEN spoke to a member of ITM's sales staff, Defendant BROWN, and asked about purchasing gold. BROWN responded that it was imperative that STOUMEN invest in gold immediately because the U.S. dollar was going to "crash", and that gold was the only "safe haven" when that crash occurred. BROWN further advised STOUMEN that rare gold coins were a better investment than gold bullion for three reasons: (1) rare coins were in constant demand by collectors and therefore "could not go down" in value and were not at risk if world bullion prices fell; (2) bullion transactions were not "private" and might result in STOUMEN's personal

information being made available on the Internet whereas rare coin purchases were "private" and involved no reporting to Government agencies; (3) bullion could be confiscated by the U.S. Government in times of national emergency, whereas rare coins were "exempt" from the laws permitting gold confiscation.

10. In reasonable reliance on these and other representations and assurances from ITM regarding the value of investing in rare coins, STOUMEN agreed to purchase some rare coins from ITM on or about March 2, 2007 for the price of $10,446.00. STOUMEN did not participate in the selection of the coins to be purchased, other than to agree to the coins BROWN recommended to her.

11. Over the next two and one-half years, BROWN made continual, unsolicited telephone calls to STOUMEN offering rare coins as investments. ITM also sent STOUMEN unsolicited written marketing materials promoting the purchase of rare coins. In these telephone calls and written materials, BROWN and ITM represented that U.S. rare coins were good, safe, low-risk investments with great profit potential, and urged STOUMEN to liquidate her other investments, including IRAs, to invest the proceeds in more coins. Based on these representations and assurances, STOUMEN paid ITM an additional $69,000 for rare coins, all of which BROWN selected for her. Among other things, STOUMEN liquidated an IRA in an amount approximating $10,000, and paid a 10% early-termination penalty to the Internal Revenue Service for doing so.

12. In 2008, STOUMEN introduced BROWN to HAHN, who is STOUMEN's mother. BROWN advised HAHN to liquidate all of her other investments and purchase rare gold coins to preserve her wealth against the collapsing U.S. dollar, market declines and possible future Government confiscations. BROWN pressured HAHN to send her documentation of all HAHN's other investments and bank holdings for evaluation, which HAHN did. BROWN was, at all times, aware that HAHN was over 83 years of age and without any knowledge concerning gold or rare coins.

13. As a result of, and in reasonable reliance upon, such representations, HAHN liquidated considerable holdings she had in stocks and other investments, including

annuities in the amount of approximately $375,000, and made nine separate coin purchases from ITM ending in November 2009, spending $991,293. HAHN's liquidations required her to incur thousands of dollars in charges for early termination and other fees and charges.

14. During the period 2008-10, ITM sent Plaintiffs regular "portfolio reviews", which listed all the coins Plaintiffs purchased from ITM along with "retail values" of each coin as of the date of the review. The "portfolio reviews" also calculated the purported increase in the coins' values since the date of purchase, which was indicated as a percentage next to each listing. With respect to the U.S. gold coins which constituted nearly all of Plaintiffs' purchases from ITM, the "portfolio reviews" rarely ever showed a decrease in value, but rather a consistent increase over time. Plaintiffs believed, in reasonable reliance on these "portfolio reviews" and oral representations from BROWN, that they were in a profit position with respect to their purchases from ITM, and in reasonable reliance thereon continued to buy coins from ITM.

15. In fact, the coins ITM sold Plaintiffs were neither good investments, nor safe ones, at the prices ITM charged, which were considerably above the coins' actual values at the time. Despite the fact that gold prices have more than tripled since Plaintiffs began their purchases from ITM in March 2007, Plaintiffs' coins are worth no more as of the date of this Complaint than approximately 60% of what Plaintiffs paid for them, and were never worth the values ITM reported on its "portfolio reviews".

16. For example, ITM sold Plaintiffs three specimens of a 1906-S $20 gold piece, two to HAHN on August 17, 2009 and October 14, 2009 for $6,963 and $6,525 respectively, and one to STOUMEN on October 7, 2009 for $6,434. The market value of each of these coins was no more than $4,000 as of the time of purchase, and is no more than that as of the date of this Complaint. As of January 14, 2010, when ITM's "portfolio review" showed a value of $7,370 for each of these coins, a purported "increase" of 13%, another specimen had just sold at a widely-reported public auction for $4,025.

17. ITM's representations concerning the advantages of investing in rare coins were false and misleading. ITM knew that the values of rare coins had not increased over 278 percent during the period 2001-07, even if the world gold prices had done so. ITM and BROWN knew that the values of rare coins are subject to decline as are bullion coins, and have, in fact, declined significantly at various times. ITM and BROWN also knew that many of the most popular bullion coins, such as U.S. American Eagle coins, are not subject to any reporting requirements and, in fact, that there are no reporting requirements for any precious metals at the time of purchase, but only when certain bullion coins are sold in quantities. Further, ITM and BROWN knew that all the past laws and regulations governing the confiscation of bullion gold in the U.S. during the 1930s were repealed long before Plaintiffs made their purchases, and that rare coins are not "exempt" in any way from a future confiscation. Finally, ITM and BROWN knew that regardless of "economic conditions", rare coins were not a safer investment than the annuities and other investments which ITM and BROWN asked Plaintiffs to liquidate in order to buy the coins.

18. Neither BROWN nor ITM advised Plaintiffs at any time of the risks of investing in rare coins, including the high markup ITM was charging, which would have to be overcome for Plaintiffs to break even, and the fact that rare coins do not necessarily appreciate in value along with increases in the world gold price. Neither BROWN nor ITM disclosed to Plaintiffs that the reason they recommended rare coins over bullion coins was that their markup and profit margin were far higher on rare coins than on bullion coins. Nor did either BROWN or ITM disclose to Plaintiffs that the investments they were offering were, in fact, considerably more risky than the annuities and other investments which Plaintiffs were liquidating in order to buy the coins.

19. The amount Plaintiffs spent on coins with ITM was a substantial portion of STOUMEN and HAHN's net worth.

////

## BROWN'S THEFT OF PLAINTIFFS' COINS

20. Early in April 2010, BROWN telephoned HAHN and told her that she would be visiting New York City and wanted to meet during her visit. She advised HAHN to remove her coins from the safe deposit box in which HAHN had been keeping her coins as well as STOUMEN's. BROWN told HAHN that the coins were safer in HAHN's apartment than in a bank that could fail as a result of a future economic catastrophe, resulting in the coins being inaccessible. During BROWN's visit, and in reliance on BROWN's advice, HAHN and BROWN removed HAHN's and STOUMEN'S coins and placed them in HAHN's apartment.

21. Later in April 2010, while still employed by ITM, BROWN again telephoned HAHN to say that she would be visiting New York City, and that she could come to HAHN's apartment and "arrange" HAHN's coins in a way that would increase their overall value.

22. HAHN agreed to allow BROWN into her apartment and have access to HAHN and STOUMEN's coins. When HAHN was absent from the room, and without either HAHN or STOUMEN's knowledge or consent, BROWN took 56 coins, for which HAHN and STOUMEN had paid $430,000, and later left the apartment with these coins. BROWN also destroyed documents belonging to HAHN and STOUMEN that had identified the coins she was stealing.

23. BROWN sold two of these 56 coins to a dealer while she was still in New York City, and then returned to Arizona where, through GBA, BROWN proceeded to sell some or all of the remaining coins she took from HAHN and STOUMEN to GBA's customers.

24. HAHN and STOUMEN did not discover the theft of their coins until late May, 2010, at which time they contacted law enforcement authorities.

## BROWN'S CRIMINAL PROSECUTION AND CONVICTION

25. In November 2010, BROWN was indicted by the New York District Attorney's office on charges of burglary, grand larceny, securities fraud, and scheme to

defraud in connection with her role in ITM's sales of coins to Plaintiffs and her taking Plaintiffs' coins. BROWN was extradited from Arizona and arraigned in New York.

26. As part of its investigation, the District Attorney's Office recovered 18 coins from the 56 that were taken by BROWN from HAHN and STOUMEN, and those are currently being held at the District Attorney's Office in New York. The remaining stolen coins have not been recovered.

27. In May 2011, BROWN pleaded guilty to scheme to defraud in the first degree in connection with the coin sales to Plaintiffs on behalf of ITM, and grand larceny in the second degree in connection with her thefts of Plaintiffs' coins. The New York District Attorney's Office stated that "BROWN fraudulently induced victims to purchase gold and silver collector coins." District Attorney Cyrus R. Vance, Jr. stated: "The defendant took advantage of the victims' fear of instability in the financial markets. It wasn't enough that the defendant encouraged the victims to spend their limited resources on these coins, she then entered their homes and profited from them again when she stole and then resold these very same coins to other unwitting victims".

28. Under New York law, scheme to defraud in the first degree requires proof that the defendant: "engages in a scheme constituting a systematic ongoing course of conduct with intent to defraud more than one person or to obtain property from more than one person by false and fraudulent pretenses, representations or promises."

29. In June 2011, BROWN was sentenced to 3-9 years in prison, and is currently serving that sentence. BROWN was also ordered to make restitution in the amount of $1 million. Plaintiffs have received nothing from BROWN in the way of restitution.

## BROWN'S PRIOR HISTORY

30. From 1997 through 2004, BROWN was employed by Reserve First Partners in Beaumont, TX, another rare coin telemarketer, first as salesperson and subsequently as assistant manager.

31. In 2004, after BROWN had announced her resignation, Reserve First Partners discovered that she had contacted numerous Reserve First customers without company

approval and told the customers to send coins to BROWN's home or make their coins available to her when she visited them at their homes. Two such customers were Guy Sibley of Gardena, California and Esther Querciagrossa of Thousand Oaks, California.

32. When customers contacted Reserve First to learn the status of these purported sales, Reserve First discovered BROWN's activities, and the fact that BROWN led customers to believe that she was acting for Reserve First when, in fact, she was appropriating to herself the proceeds of these transactions. In at least one instance, BROWN re-sold coins taken from one customer in this manner to another customer, retaining the proceeds for herself.

33. Reserve First brought suit against BROWN for breach of contract and misappropriation in the District Court, Jefferson County, Texas, and on February 26, 2008, after a trial on the merits, that court determined that "Brown made secret arrangements with customers to buy and sell coins or other precious metals for her own benefit" and rendered judgment against BROWN for injunctive relief and $500,000 damages.

34. Upon information and belief, BROWN's employment with Reserve First was her only rare coin-related employment prior to the commencement of her employment with ITM.

35. In her guilty plea in New York, BROWN admitted to also having stolen hundreds of thousands of dollars worth of coins from another ITM client, an elderly woman in California. Upon information and belief, BROWN also participated with another ITM employee, John Milton, in defrauding additional ITM clients during BROWN's employment there.

36. BROWN twice filed for bankruptcy protection in Arizona in 2005, and as part of Chapter 13 proceedings in one of these cases, Reserve First filed objections with the Arizona bankruptcy court detailing some of BROWN's fraudulent activities.

37. In addition to the above, public records accessible to ITM during the period prior to and during BROWN's employment there indicate that BROWN had multiple

criminal citations for drug and alcohol-related offenses, as well as civil judgments, federal tax deficiencies, and evictions before and during her employment with ITM.

## FIRST CAUSE OF ACTION – VIOLATION OF TELEMARKETING AND CONSUMER FRAUD AND ABUSE PREVENTION ACT

38. Plaintiffs repeat each allegation contained in Paragraphs 1-37 hereof as though set forth in full here.

39. ITM committed deceptive telemarketing acts and practices in violation of the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §6101-08, and the Federal Trade Commission's Telemarketing Sales Rule, 16 C.F.R. §310.1 et seq., by

(a) misrepresenting, directly or by implication, the following material information relating to the coins:

(1) the total costs to purchase or receive the coins, including but not limited to the amounts by which the coins' purchase prices exceeded their fair market values;

(2) material aspects of the performance, efficacy, nature or central characteristics of the coins including, but not limited to, their high markups, lack of benefits over bullion coins or Plaintiffs' existing investments, market risk, and illiquidity;

(3) material aspects of the coins' investment potential including, but not limited to, risk, liquidity, earnings potential, or profitability.

(b) making false and misleading statements to induce STOUMEN and HAHN to purchase coins including, but not limited to, statements relating to economic conditions, the markups ITM was charging over the coins' fair market values, the advantages of buying rare coins over bullion and Plaintiffs' existing investments, and market movements following each of Plaintiffs' purchases.

40. Plaintiffs were adversely affected by ITM's conduct for purposes of 15 U.S.C. §6104(a) in an amount exceeding $1,000,000.

41. Plaintiffs are entitled to judgment for their damages, costs of suit and attorneys' fees in accordance with 15 U.S.C. §6104(a) and (d).

## SECOND CAUSE OF ACTION – FRAUD (INTENTIONAL MISREPRESENTATION)

42. Plaintiffs repeat each allegation contained in Paragraphs 1-37 hereof as though set forth in full here.

43. ITM made various representations to Plaintiffs regarding the past appreciation history, current value, investment potential and safety of an investment in U.S. gold coins, and regarding the advantages of buying numismatic coins over gold bullion or other precious metals, and over Plaintiffs' existing investments. ITM further provided Plaintiffs with "portfolio reviews" which represented that almost every one of the gold coins Plaintiffs previously purchased from ITM had increased in value since Plaintiffs' purchase dates.

44. These representations would be material to a reasonable investor's decision to purchase rare coins, and STOUMEN and HAHN reasonably relied on them in agreeing to their purchases.

45. These representations were false, in that the gold coins ITM sold to STOUMEN and HAHN did not have the past appreciation history, current value, investment potential, safety or advantages over Plaintiffs' existing investments represented by ITM, the costs of buying rare coins from ITM were far greater than represented, and the coins Plaintiffs purchased from ITM did not appreciate in value as represented, if at all.

46. ITM knew that these representations were false and acted with oppression, fraud and malice in intentionally depriving STOUMEN and HAHN of legal rights and otherwise injuring them.

47. As a result of their reliance on ITM's knowingly false representations, Plaintiffs have been damaged in an amount exceeding $1,000,000, and are entitled to

recovery of said damages, restitution of all costs and expenses associated with their coin purchases, interest, and punitive damages.

**THIRD CAUSE OF ACTION – FRAUD (FAILURE TO DISCLOSE)**

48. Plaintiffs repeat each allegation contained in Paragraphs 1-37 hereof as though set forth in full here.

49. ITM, at all relevant times, represented that it acted on behalf of its customers, in the customers' best interests, to invest their money properly and for maximum preservation of capital and/or profit, and in so doing undertook an obligation to advise its clients of all material aspects of the investments it offered.

50. ITM failed to disclose to STOUMEN and HAHN various material aspects of the investment in rare coins that ITM was offering, including:

(a) that ITM's prices were far in excess of the actual value of the coins, making them very poor and unsafe investments;

(b) that there was no basis for ITM's predictions that the coins it was selling would increase in price to the extent that STOUMEN or HAHN would break even, much less make a profit.

51. The facts which ITM failed to disclose to STOUMEN and HAHN would be material to a person's decision to purchase rare coins for investment purposes, and had ITM disclosed these facts, STOUMEN and HAHN would not have agreed to purchase coins from ITM.

52. ITM knew the facts that it failed to disclose to STOUMEN and HAHN, and acted with oppression, fraud and malice in intentionally depriving STOUMEN and HAHN of legal rights and otherwise injuring her.

53. As a result of ITM's failure to disclose material facts to STOUMEN and HAHN, Plaintiffs have been damaged in an amount exceeding $1,000,000, and are entitled to recovery of said damages, restitution of all costs and expenses associated with their coin purchases, interest, and punitive damages.

**FOURTH CAUSE OF ACTION – DECEPTIVE ACTS OR PRACTICES**

54. Plaintiffs repeat each allegation contained in Paragraphs 1-37 hereof as though set forth in full here.

55. ITM's conduct constitutes a deceptive act or practice under N.Y. Gen.Bus. L. §349 in that ITM

(a) directed its advertisements, marketing materials and telephone sales presentations to consumers generally;

(b) acted so as to deceive a reasonable consumer acting reasonably under the circumstances.

56. As a result of ITM's unlawful conduct, Plaintiffs have been damaged in an amount exceeding $1,000,000.

57. Under N.Y. Gen. Bus. L. §349, Plaintiffs are entitled to their actual damages, an order enjoining ITM from its unlawful conduct, and an award of their attorney's fees.

**FIFTH CAUSE OF ACTION -- NEGLIGENCE**

58. Plaintiffs repeat each allegation contained in Paragraphs 1-37 hereof as though set forth in full here.

59. BROWN was unfit for employment by ITM, based upon her personal criminal and civil citation history, and here previous history of abusing customer relationships in connection with the sales of rare coins, both at Reserve First in Texas and at ITM itself.

60. ITM had actual or constructive knowledge of BROWN's unfitness, as her personal criminal and civil citations, as well as her history with Reserve First would have been disclosed by a reasonable inquiry or investigation.

61. BROWN's theft of Plaintiffs' coins was foreseeable given her history and proclivities.

62. Plaintiffs' injuries in connection with their coin purchases and the thefts of coins by BROWN were caused by BROWN's employment by ITM.

WHEREFORE, Plaintiffs pray for judgment

(a) for compensatory damages against all Defendants, jointly and severally, as proven at trial;

(b) for punitive damages;

(c) for an award of interest, Plaintiffs' costs and attorney's fees;

(d) for such other and further relief as to the Court may seem just.

Dated: October 18, 2011

_____
Armen R. Vartian (AV-4124)
LAW OFFICES OF ARMEN R. VARTIAN
1601 N.Sepulveda Blvd. #581
Manhattan Beach, CA 47401
(310) 372-1355 phone
(866) 427-3820 fax
info@vartianlaw.com